The third and final case of the day, Mosley v. Preston Cycles, 21-13527. We have Mr. Walker here for the appellant, Ms. Guerrero here for the appellee. No hurry. Whenever you're ready, Mr. Walker. Get yourself settled. May it please the Court, my name is Jermaine, or J. A. Walker, and I am counsel for the appellant in this matter, Juan Tamian, or Juan Mosley. Thank you for the opportunity to present this oral argument. The issues before this Court on appeal are, first, whether the district court committed an error by granting summary judgment to defendant by weighing the evidence, essentially performing a jury function respectfully, when determining if there was a genuine issue of trial when considering the convincing mosaic of circumstantial evidence framework. Can I ask you about the convincing mosaic framework? Yes, Your Honor. And it's about the nature of your claim. Are you bringing a mixed motive claim, or are you bringing a single motive claim? It's a single motive claim, Your Honor. Okay. That's very helpful. Okay. So, go ahead, I interrupted you, but I wanted to clarify that. Okay, sure. Plaintiff contends, Your Honor, that the district court misapplied the summary judgment standard on this issue, so its grant of summary judgment should be reversed on this basis alone, and the magistrate's judge report and recommendation to deny defendant's motion for summary judgment should be adopted. Secondarily, if the district court's decision is not reversed on that basis alone, then considering this is a de novo review court, the district court should be reversed based upon the record, which is replete with facts upon which a reasonable jury could find that the defendant fired my client because he is black. Can I ask you just a quick question about this? So, I agree with you that some of the allegations in this case are wild, but you've got to get all the way through to the defendant, so there's the cat's paw theory of how it is that Lewis is sort of the mover and shaker here. What's the best evidence that Lewis was the one who drove the firing decision? Certainly, Your Honor, there is evidence in the record, and I will point to the deposition of the Director of Human Resources, Jean Chambers, and that's on page 36 of her deposition, where it's, and this is, keep in mind, two months after Mr. Lewis arrived, during her deposition, it is asked, she testified, pardon me, the department manager contacted me and let me know what he wanted to, that he wanted to let Juan go. Of course, my question is why, and after that, I explained to him that I could not give him authority, but he needed to take it to Mr. Preston and talk to him about it. And she's referring to the department manager, meaning Mr. Lewis. So, counsel, but the problem is, I understand, that gets you to the Human Resources officer, but who is the one, what does the undisputed evidence show was the one that made the recommendation to Mr. Preston? Yes, Your Honor, and Mr. Lewis indeed made a recommendation to Mr. Preston. But he wasn't the only one, was he? That is correct, Your Honor. So that's what, so cat's paw, as I understand it, and I'm not an expert in this area, I'm asking, cat's paw, as I understand it, is I essentially control the cat's paw. I'm the one that controls the arm. I'm it. I control the cat because I'm the arm. That's as I understand it. But if there's two people, one who is, the evidence shows, is acting on racial motives, and one who no evidence shows at all is acting on any sort of racial motive, how can we say that the person who is acting on a racial motive is the cat's paw for the actual decision maker? Sure, and two points to make to answer that question. First, it's important to keep in mind that Mr. Lewis was the general manager of the entire facility, while Mr. Hammers was the general sales manager. So Mr. Lewis was in a much higher position. And there's testimony in the record which indicates that he was more of hands-off. The owner essentially turned the keys over to him to run the deal. Well, we'll talk about that in a second because then we have to get to the rebutting the presumption. And the other issue with that is, and this Court has ruled, that when there is an individual that is tainted, that is part of the decision-making process, that the person, it's required that the cat's, pardon me, and I'll read you the whole thing here. It's long been held that where there are multiple decision makers, disparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias. And that's in Jones v. Gerwins, 874 F2D 1534, 11th Circuit case 1989, and in Anderson v. WB. Let me be clear. There's no doubt that's true. That's 100 percent accurate. But that's not a cat's paw theory case. I'm talking about for a cat's paw case. So there's a recommender, and the recommender is essentially driving the bus. But in the normal case, the recommender has the racial motive, and the guy driving the guy, the actual keys, is sort of checked out and doesn't check on their own. They rely on the underlying manager. But where you have two people, one with the racial motive and one with not, that are recommending independently to the owner, how can we say that there's a cat's paw, that the person with the racial motive is controlling the decision-making? Well, respectfully, Your Honor, I think that is a question of fact in terms of the nature and scope of the degree of recommending this termination. I'll just read you what the testimony is that I understand it, and please correct me if I'm wrong. This is from docket entry 59-5 at 13. In April 2018, Mr. Hammers reported his concerns regarding plaintiff to me and Mr. Lewis and recommended that the dealership end his employment. That's from the affidavit of Mr. Preston. And then in his deposition, he says, quote, it would have been directly from the manager and the general sales manager. They would have, they jointly presented their concerns and their case for separating us. That evidence is not disputed as I understand it, correct? Your Honor, yes, that is correct. They did both provide a recommendation. But I think what's important here, Your Honor, is that you have someone that's in a higher position that made that recommendation. And I believe that in Mr. Hammers' declaration, he also says that he presented it to Mr. Lewis. So, therefore, you have that chain now where you have a lower-ranked person representing it to a higher-ranked person who then they go to the owner. Of what relevance in this connection, if any, is the fact that we've got testimony in the record that Lewis told someone else that he, sorry, that the plaintiff was fired because he wanted to wear FUBU to work every day. And Hammers, at least, the co-recommender, so to speak, never had any complaint about the plaintiff's appearance. Of what relevance is that to this cat's ball question? That's significantly relevant, Your Honor. I think, first, it goes to show that Mr. Lewis was involved, directly involved, in making that recommendation and influenced Mr. Preston because he's talking about it the day after. And it goes to the cat's ball issue, indicating, well, if Mr. Preston did an independent investigation, it didn't seem like he did, but, you know, you have cat's ball there. Then there's also a second proximate cause cat's ball argument that I don't need to make it, but it's there that can be relied upon, the jury can rely upon, where essentially what he's done is he's effectuated his racial animus in the termination, and he's talking about it right afterwards. So for part of cat's ball, this is the second part of it. So we've been talking about the first part, which is someone who has a racial motive is making the one recommending the termination. The second part is that the decision maker takes the recommendation, quote, without independently investigating the complaint against the employee. That's what gets you to the proximate cause that you're talking about. And as I understand it, again, correct me if I'm wrong, Mr. Preston gives the following declaration testimony. I am actively involved in the dealership operations and maintain an office at the dealership. I am generally aware of the day-to-day operations. That's at page two. I myself observe plaintiff failing to follow directions or responding to his supervisor's directions by either refusing to follow the direction or questioning why he should have to follow the direction if he was making motorcycle sales at four. I myself conveyed that requirement, contacting customers on downtime, to plaintiff on multiple occasions. That's at five. I also observed that the plaintiff often either did not report to work early enough to assist with preparing the dealership to open. He simply didn't assist those, such as driving motorcycles to the front so that they can be displayed for customers, also at five. Quote, I often observed and heard about plaintiff engaging in disagreements with other motorcycle associates over issues. That's at six. From my observation and interactions with plaintiff, it was my opinion that plaintiff was only interested in increasing his own sales numbers and not in assisting. That's at eight. I told plaintiff that I agreed with the valuation, this is that evaluation for January or December, upon my own observations of his work and reports that I had received from Mr. Hammers. That's at ten. In the months following the December performance evaluation, I did not see an improvement in his attitude or willingness to follow directions given to him or his work cooperatively. That's at 13. And then finally, and this is the really key one, my approval was based upon my own interactions with plaintiff and my own observations of his conduct and attitude toward the dealership's management. How is that disputed? I know that's a long question, but where is that disputed in the record? Yeah, absolutely, Your Honor, and I certainly will answer that. Well, first of it, that was a declaration made after the fact. It wasn't during the deposition, so I contend it is somewhat self-serving. But in Mr. Mosley's, pardon me, in Mr. Preston's own deposition, he contradicts himself. He says, and this is on page 27, he goes, Conversely, as general manager of the dealership, Mr. Lewis was the dealership's operator. He was responsible for all departments within the dealership, and he managed the dealership on a day-to-day basis. Betty Preston confirms that on page 25 of her deposition. Mr. Mosley confirms that on page 50 of his deposition. Jameson Previtt, who was the finance manager at the dealership from June 2017 through May 2018. But how does that contradict, how does that contradict, sorry to interrupt, how does that contradict Mr. Preston's statement about his own, that he made his own observations, and I told you what they were, throughout about the plaintiff's conduct, and that is why he agreed with the recommendation? How does that contradict that? Well, it's kind of mendacity, Your Honor. It doesn't squarely contradict it, but it raises a mendacity and a credibility issue that I think should go to a jury because he's really talking out of both sides. He's saying, yeah, you know, he's hands-off, controlling the day-to-day, but at the same time he's saying, oh, I observed everything. And another, to that point as well, why wasn't he fired in February? Why did they wait until, you know, April after Mr. Lewis arrived? They could have, if this was such a problem, they could have fired him early. But you have a general manager that they hired who would openly express, and it's in the record, I don't have to go through all that, but it's in the record, openly express animus, and then two months he's fired. And my client was a top-selling motorcycle sales associate, Your Honor, within the dealership. I do have some more time. Actually, in fairness, you don't. You're a minute 20 over. But we'll give you your full rebuttal time. It's all good. Okay, thank you. Thank you so much. Thank you. Ms. Guerrero, let's hear from you. Good morning. May it please the Court. My name is Meredith Guerrero, and I represent the employer in this case, Preston Cycles West, who is the defendant below and is the appellee in this court. I want to give a quick overview of why plaintiff cannot survive summary judgment on his claims, on his race discrimination claims. One you talked about in great detail with my colleague is the causation element. There is no— I mean, isn't for you, isn't that where the action is in this case? Because, I mean, you can't possibly argue that there's not evidence of racial animus spewing out of Lewis' mouth. Your Honor, I would say that there is record evidence that Mr. Lewis may have had racist beliefs or have made racist statements. However, there is not evidence that that was the animus for the decision to terminate Mr. Mosley's— Okay, so that's fine. So I just want to make sure that, like, now we've shrunk the case. I mean, this is not about whether or not Lewis, you know, sort of spewed racial nonsense. It's about whether or not that animated the firing decision. That's all we're really talking about. Absolutely, Your Honor. You nailed it. Okay, so what then about—what about the FUBU comment? Well, here's the thing about the FUBU comment. I don't see that the district court paid that any attention at all. Because I don't think it's worth any attention at all. Well, but just careful. I mean, at summary judgment—and I'm not trying to put words in your mouth— but, I mean, it's not our job to sort of adjudicate the relative worth or weight of evidence. Sure. It's out there. Sure. But, however, the comment that—and this is in the deposition of Jamison Previtt— that he is the one that reported that he heard the comment. He's the one that gave testimony on this. That's the only testimony at all that's worth paying attention to because the plaintiff didn't hear the comment. He was already gone at that point. But, I mean, we can't on summary judgment dispute that Lewis said it, right? Sure. It doesn't matter if Preston—if Mosley heard it, Lewis said it. Sure. But my point is the only testimony on it that we can really look at is Jamison Previtt. And here's what he said about it. He said that there was this offhand comment that a plaintiff was let go because he was wearing FUBU to work. However, when I was questioning Mr. Previtt, I asked him to explain, well, did he say anything else to show that he even understood that FUBU was related to the plaintiff's race? But doesn't that square up with all the nastiness that he was spewing about the plaintiff's race to begin with, that he was blacker than most, that he looked like a street person because he wore baggy clothes? I mean, it's all of a piece. The FUBU thing fits right in. That is circumstantial evidence of possible racist views of Mr. Lewis. And then he said he was fired because he wanted to wear FUBU. But the evidence that is undisputed in the record shows that Mr. Lewis played almost no part in the decision to end plaintiff's employment. He was, at best, present during the discussions. There's no evidence that he actually influenced the decision at all other than basically rubber-stamping what Mr. Hammers had recommended. So that's the issue. In other words, I think, I don't want to put words in my colleague's mouth, but I think what he's saying, and I feel the same way, is there's a lot of evidence that would make a convincing mosaic here if this was connected to the decision-maker, if it met that last piece of by the decision-maker. And that's really what this case is about is, is there evidence connecting this to the decision-maker? You agree that Mr. Lewis, who said all of these things, made the recommendation to fire the plaintiff to Mr. Preston, correct? Well, he was present during the discussions. You don't agree that there's record evidence to say that he jointly recommended? He said that he approved the decision. And actually, Mr. Preston testified that he actually said that Mr. Lewis didn't really take much of a position on it, but said that he would support his general sales manager, Robert Hammers. Counsel, here's the deposition testimony. It's at docket entry 59-3 and 9. Quote, it would have been directly, this is the recommendation, it would have been directly from the general manager and the general sales manager. That's Mr. Hammers and Mr. Lewis. They would have, they jointly presented their concerns and their case for us separating. Sure, sure. A reasonable jury could take that to mean that Mr. Lewis was one of the people who recommended that he be fired, correct? Sure, that he recommended that he be fired for all of the reasons that Robert Hammers presented of why he wanted him fired. There's no evidence that in the discussions with Mr. Preston that there was any influence of racial animus. I'm sure in the room with Mr. Preston, who was African-American, he didn't spout that he wanted to fire this person because he was African-American. I'm certain that didn't happen. But the question is, did he have a racial animus, evidence of racial animus at this time, such that when he did go in the room, that was on his mind, plus the evidence from Mr. Previte that he fired him because of this clothing? Why can a reasonable jury not take all that to mean that he did in fact recommend, at least in part, or motivated by or because of the plaintiff's race? I think the causal chain is broken. As you mentioned in questioning my colleague, the causal chain is broken because Mr. Preston, it's undisputed that Mr. Preston was the final decision maker. So for you to win, that's the piece for which only you can win here, really, is if Mr. Preston made an independent decision of what was recommended to him by Mr. Lewis, correct? I would say that's one part of it, but I don't think that's the only reason that he cannot get past summary judgment. I think there are other reasons as well. I think that he has failed to show that there is a convincing mosaic because the case law on this is really very clear that this is a fallback position, and this is — it's called like a gap filler in some cases. I'm sorry. Are you, like, criticizing or suggesting that we abandon convincing mosaic? I'm saying that even if we don't prevail on the causation argument here, that Mr. Preston was the one that independently made the decision and that the whole discussion was even started because of Robert Hammers, not Jeff Lewis. But even if we don't prevail on that, there's not sufficient evidence to get to a convincing mosaic of a discriminatory animus. Really? Really? Because the only statement that plays any part, that has any bearing on the termination decision, is after the fact. But we've said that there doesn't have to be that connection. Jenkins is our most recent case discussing it, but we were clear there and elsewhere that the point of convincing mosaic is it doesn't have to be directly related. It's inferences that you draw in order to get to that inference. So here, if you have someone who spouts ten different racial epithets over the course of six months, and then six months later decides to fire someone of the race to which he has made those epithets, how is that not evidence that that person is motivated, at least in part, by racial animus? Excuse me. I'm sorry, Your Honors. It goes beyond that. As Judge Jones made clear in his order, it's a totality of the circumstances analysis. It certainly is, but that's pretty strong medicine if we're looking at bits and pieces of evidence. And then you add to that the fact that, despite the fact that the plaintiff seemed to be a not very good employee for about two years, it was at the very moment when the racist guy starts that two months later he's fired. And then you have the comment that he was actually fired for clothing that is associated with that race. So if you put that together, that seems to be a pretty—assuming Mr. Lewis is the decision maker, or under a cat's paw theory was, that seems to be pretty strong evidence of a convincing mosaic. I don't know what more a plaintiff can come forward with. Well, I do want to correct a little bit of what you just said. So he actually was only employed at the dealership for a total of one year. You're talking about the plaintiff? The plaintiff, yes. Okay. I apologize. No, that's okay. But I think it's important to see because Plaintiff alleges that this was suspicious timing. Well, it's a — there's timing, but it's not suspicious. And it doesn't show — it doesn't also— I think they're showing the timing. And, again, it's not perfect. It's all bits and pieces. But the timing between Mr. Lewis' hire and the ultimate decision, not the plaintiff's hiring and the ultimate decision. Except for there is substantial evidence that these issues had been going on. They had been discussed with him. There is a recording of a performance evaluation between Mr. Hammers and the plaintiff. But is that the one where Hammers tears it up in front of him and says, let's, like, start afresh? He does because he says, we're going to try to make this work. And that's why they didn't just, okay, you know, you've been here six months. We're tired of you. We're done. Yeah. I mean, here's the thing. It's not that he had a perfect, spotless, blemishless record for 10 months and then Lewis shows up and two months later he's gone. But there was no reason to think that after 10 months he was on the precipice of being fired and then Lewis shows up and two months later Lewis shows up, spouts, you know, sort of racial hatred, and then two months later he's gone. I mean, is that not a mosaic from which a jury could reasonably infer that there was discriminatory animus? I don't agree that it is, Your Honor. And I think what's important here is Lewis didn't start this discussion. This discussion was started by Robert Hammers. So perhaps if we were in the situation where Lewis came and then he started saying, you know, we need to get rid of him, and that would be more probative of the fact. But Mr. Hammers is the one that said, I'm fed up. I'm done with it, and I want us to part ways and move on. And then the discussion was had with Mr. Preston jointly, and it was not Mr. Lewis only going to Mr. Preston and recommending this. This was Mr. Hammers and Mr. Lewis. And Mr. Preston also clarifies that it was Mr. Hammers who was actively pushing for the termination, not Mr. Lewis. In Catspaw Land, and I'll repeat what Judge Luck said earlier, I just don't know, so I'm just genuinely asking, but if we're in Catspaw Land, let's assume that Preston made no investigation. He just rubber-stamped whatever old thing was shoved under his nose. And Lewis is a hardened racist and had racist motives. Hammers is not a hardened racist and didn't harbor racist motives. Is the mere fact that the two of them co-recommended this course of action, does that alone defeat the plaintiff's claim? Yes, I think it does, Your Honor, because there is case law, and if you bear with me for a moment so that I can find it here, there is case law that actually explains that when you have someone who's not the ultimate decision-maker, that the inference that there was a racial animus doesn't transfer because the person who made the ultimate decision, and also in this case, there's a co-recommender and perhaps there's a co-recommender. Well, I guess you're kind of mixing up my hypo, though. I recognize that Preston is de facto the ultimate decision-maker, but if we're in cat's paw land, and in my hypothetical, Preston didn't do beans, didn't do anything, didn't do any investigation. He just rubber-stamped the recommendation. So I'm talking about the mere fact that there's a co-recommender. Does that alone defeat the claim, even if Lewis, as one of the two co-recommenders, is a hardened racist harboring racial animus? I think it does, Your Honor, and especially in this case because Lewis – Can you flesh that out? The because part is – flesh out the legal part of it, not the factual part of it. Is that because – and I'm asking. Is that because under a cat's paw theory, the theory is that the person who has the racial motivations controls the decision alone? No, it's because they influence the decision with the racial animus. Well, so doesn't – in a co-recommender situation, doesn't – I mean doesn't the hardened racist at the very least influence the decision? He might not control it, but he influences it. There's no evidence that he did, Your Honor, because all of the evidence is that Robert Hammers is the one that recommended it and he gave a long list of reasons. But I thought we were talking about there being a co-recommendation. I mean, you know – I'm sorry. Is there a co-recommendation of Lewis and Hammers or not? I think there is a rubber stamp by Lewis. I don't think that there is – was it jointly presented to Mr. Preston? Yes, but I think that was just procedure of the dealership. I don't think that Mr. Lewis – there's no evidence that Mr. Lewis would have been in Mr. Preston's office recommending the termination but for the fact that Robert Hammers – So is your theory then that we've got some kind of double cat's paw thing going on where Hammer is the only guy really pulling strings and Lewis, in fact, is a puppet in the same way that Preston is a puppet? Potentially, yes. I mean, I don't think that that's fleshed out in the record because there's just not any evidence that Hammers was controlling Lewis, but there is evidence that Lewis was deferring to Hammers. The only evidence in the record about what Mr. Lewis actually did in the discussions regarding the termination is that he basically was supporting his general sales manager because he was the one who was the day-to-day supervisor of Mr. – of the plaintiff. And what's the evidence in the record that post Lewis' arrival that somehow Hammers' attitude toward Mosley had changed? Like the whole tearing up of the performance evaluation didn't take – Hammers has decided he's no good anyway. I think the evidence in the record shows that – and plaintiff himself testified to this – that from day one he thought that Hammers didn't like him and that Hammers was on him to perform his duties, to do more. He testified at great length about what changed for him when Hammers came. Now, what's not in the record is any evidence that anything that was done by Mr. Hammers was done with any kind of discriminatory animus. And I think, in fact, there's testimony from plaintiff himself saying that he didn't believe that to be the case. So there's no evidence of Lewis influencing Hammers' decision. The only evidence that we have shows that Hammers made the recommendation and that Mr. Preston, upon receiving that recommendation, did his own investigation and did his own consideration. And his declaration is very clear on what steps he went through and what he had himself personally observed and the reason that he himself decided to terminate plaintiff. Okay. Anything else? Okay, very well. Thank you so much for your argument. Mr. Walker, you've got your four minutes of rebuttal time remaining. So, counsel, before you begin, it would be really helpful to address that last piece, which is – so I think we've narrowed some things down, which is helpful. So we agree that a joint recommender could influence, but your opposing counsel is saying that under – and I like the way that my colleague put it, a double cat's paw theory, that Hammers was the one who really started the ball rolling and all Lewis did was simply communicate that ball to Mr. Preston. So it's really Mr. Hammers that's the cat's paw. What evidence is there to show that Mr. Lewis independently, not just by Hammers, but independently decided, I'm going to recommend firing the plaintiff? Yes, as far as the evidence, Your Honor, I point you to the deposition of Jeanne Chambers, where it is on record that – That's the one you read earlier? That's the one I read earlier. So that is evidence that he was involved. The other evidence, there's a footnote in the order, I believe it's on page 19, where there's a reference to we, where they're both at the termination table and Hammers refers to we. He's definitely involved. So there is clearly evidence in the record. You have evidence from Mr. Preston himself at his deposition that you've referred to that, yes, I did get a recommendation from Mr. Lewis. So he is squarely involved and you have clear evidence in the record establishing that. So in your estimation, the way this cat's paw thing works, your barrier is not Hammers but Preston. Is that the way you see it? Like the piece you've got to deal with is like did Preston do something independently or didn't he? Right. And to be clear, there are – argument that I'm making, there are two variations of cat's paw. There's the vicarious liability element variation and there's approximate cause variation. Under the vicarious liability variation, you will have liability imposed on the company if the decision maker followed a biased recommendation without independent investigation, essentially rubber stamping the biased recommendation that was presented to them. And that's established in cases within the circuit and I believe it's the Supreme Court. Now, the second variation of cat's paw deals with proximate cause. And in that theory in the Staub case, the U.S. Supreme Court's case, Staub v. Proctor Hospital, what that argument in theory is is now, okay, you have someone with discriminatory animus. He's clearly a supervisor. He's a general manager. And he acted on that in a way to cause an adverse action and that act was the proximate cause. Two issues or two questions regarding that. One is the case you're referring to, that is not a Title VII case, correct? No, that is a USERRA case. Okay, right. Okay. And do you know if we or the Supreme Court has ever applied that vicarious liability theory in a Title VII case? Or are you talking now about proximate cause theory? Sorry, I meant proximate cause. I just wanted to make sure. Sorry, the proximate cause. Your Honor, I could not locate one. Okay. But I would advance that, you know, you're talking about employment discrimination. You're talking about a lot of the same type of theory. And I understand that. The second question is, if they can show an intervening act that cuts off the causal chain, in other words, an independent decision by the decision maker that would cut off the proximate chain, that would defeat the proximate cause or the inference that you're trying to draw, correct? With the vicarious liability? No, I'm talking about it for proximate cause. Proximate cause. You know, if the evidence was undisputed, and I'm not saying it is, but it was undisputed, I am the owner, I am in charge, I independently saw all of this, and I independently made a decision of this, regardless of whatever recommendation was given to me, that would defeat any proximate cause inference that would be drawn from a cat's paw theory, correct? Your Honor, I don't necessarily think so. And I don't know if the Court really addressed that nuance, because I think you still have a person with supervisory authority expressing racial animus. And if you in your mind are trying to effectuate this, you're going to. My only concern is if that's true, then any time there is a racial ‑‑ someone expresses racial animus where there's a supervisor will always win in a ‑‑ and that doesn't seem to be what the law requires, and I've never read anything like that, but I think that would be the implication of reading it that way. I understand your point, but I will note that I really don't need that. I know, and we're talking like 30 levels away, I understand. Yeah, yeah, I understand your point, and it may be something to flesh out. Okay. Thank you both very much. That case is submitted, and the Court is adjourned. All rise.